Freeman, J.,
delivered the opinion of the- Court.
The bill in this case is filed to set aside a conveyance made by Mrs. Shaw, of a life interest in certain real estate in the City of Memphis. The ground on which the relief is sought, is, that in 1862 or 1863 R. M. Alexander, a brother-in-law of the complainant, and F. Y. Carlile, the husband of the defendant, combined together to defraud the complainant of her property; that in pursuance of this arrangement, Alexander was sent through *596 the Federal lines, from the City of Memphis, Tennessee,, to the City of Atlanta, Georgia, where the complainant then resided; that owing to the confidence of the complainant in said Alexander, she was easily imposed upon; and that by reason of various statements made by Alexander, and advice given her, she was induced to sell the property to him, as agent of Carlile,, for two thousand dollars, ($2,000), in Confederate money, which is alleged to have been of no value. This sale was made in November, 1862, and a deed executed of that date. Afterwards, perhaps in December, 1863, a second deed was executed, owing. to some alleged informality in the first.
The bill charges that Alexander had a secret interest in the purchase, or was to have a large sum-for his services.
■Without enumerating all the allegations of the bill,, it suffices to say, that it raises two questions for our decision. _ The first: Whether the deed was obtained by the fraud, or undue influence of Alexander, in pursuance of the combination charged, and in violation of the duties of any trust relation arising out of his alleged agency, to take charge of the houses, rent them, pay taxes, etc.
The second: Whether the contract and conveyance is void by reason of the fact charged, that Alexander and Carlile were acting in violation of the proclamation of the President of the United States, and the Act of Congress, in going beyond the Federal lines, and making the trade with a resident of the Confederate States — the two Sections being at war.
*597 As to the first question, that the deed was obtained by fraud or misrepresentation, we need but say, that the allegations of the bill are positively denied by the ^answers, and are not sustained by the proof.
The only proof of agency existent between Alexander and Mrs. Shaw is, that he had leased one of "the houses for three years from her, at a rent of $600 per annum, and was authorized to rent some wooden tenements on Washington Street, collect the rents, and pay the taxes. We can see nothing in 'this position to prevent or interfere in any way with ffiis acting as agent of Carlile for the purchase of the property — no fraud or undue advantage intervening.
It is not pretended that Alexander did not disclose 'his agency for Carlile, thus notifying the complainant that, so far as the sale was concerned, he was acting in antagonism to her, and for another. We may add, that, if the statements alleged to have been made by Alexander were shown clearly to have been made by him, we could not on this alone set aside the deed, lor the simple reason, that most of them would be but -opinion, and that too of the agent of the party who was seeking to purchase the property, and it would be the party’s own folly to have trusted to his statements under the circumstances; but in addition, so far as any facts are alleged to have been stated, it is not shown in this record, that any word was not true— most certainly it is not shown that all that was said was not honestly believed to be' true.
The next question presented is one on which more ¡or less of difficulty arises, that is, As to the validity *598 of the contract, because of the assumed relation of the parties, growing out of the existence of the late Civil War, and the occupation of Memphis, Tennessee, by the Federal, army, and its control by Federal military authorities.
It may be conceded as settled law, that upon the breaking out of a war, all commercial intercourse is forbidden as between the citizens or inhabitants of the respective belligerent countries. “This general rule is. subject to but few exceptions, and these exceptions are-founded on motives of humanity, such as bills drawn by a prisoner in an enemy’s country, and purchased by an enemy, the money going to supply his necessities and relieve his wants — and other well known, cases, that do not break upon the soundness of the-general rule:” See Halleok Int. Law,-359, s. 9 and 11. The principle on which this rule rests is, that a war makes the subjects of the respective belligerents, each, the enemy of the other, and that this relation can. not be modified or changed at the will of individuals. Conceding the rule in its fullest extent, the question recurs, Does it apply not only as between the two-belligerents, and the inhabitants of their respective countries, but also to the case of the territory of one-belligerent invaded by the other and held by military occupation, as enemy’s territory, and governed and controlled by military regulations?
It would seem that on principle it would be clear,, that the general rule had no application as to. intercourse between citizens of the occupied territory, within-the lines of the invading foe, and citizens of the same- *599 country beyond those lines, for the reason that the rule is based on the existence of the enemy relation between the parties, or between their respective governments. Therefore, when such relation did not exist,, the rule could properly have no application.
If we have given the correct ground on which the rule stands, that is, the existence or non-existence of the enemy relation, as between the parties, or their governments, thus forbidding, as * has been said, all but hostile intercourse, then the simple question for settlement is, Was Memphis, or any other portion of Tennessee, during the late Civil War, by virtue of simple military occupation, and no more, converted into friendly territory, as to the United States, and its inhabitants made, not only citizens of the United States-absolutely, and relieved of all belligerent disabilities,, but also transformed at once by such occupation into enemies of the rest of the State not thus occupied, as well as the other Southern States engaged in the War?
“Mere military occupation,” says Mr. Halleck, “of a territory by the forces of a belligerent, (without confirmation of conquest by one of the modes recognized in International Law) does not, in general, change the national character of the inhabitants,” — and, he adds “So the inhabitants of territory in possession and under the government of the conqueror, prior to cession or complete conquest for any commercial and belligerent purpose, are considered by other countries as subjects-of the conqueror, notwithstanding that he himself may regard them as aliens, with respect to the inhabitants of his other dominions.” In short, the particular *600 status of the people of such territory, as to its relations with the occupying power, is determined by the will of the conqueror, and that position, when authoritatively announced, “governs the courts as well as other departments of his own country”: Halleck, 718, s. 30. But we take it, that this can only apply to the action of the occupying belligerent, and control the decisions of the courts of his own ' government: — it can have no effect beyond this, in fixing the relation of the people of the occupied territory to the rest of the country, of which it is a part, engaged in carrying on the war, and remaining unoccupied by the invading foe. What that relation, as between themselves, is, must be determined upon general principles, and considerations found in the nature of the existent fact of a war between two countries, and the analogies furnished by the general Law of Nations. Such an occupation in the midst of a war is, in its nature, temporary and shifting, subject to the uncertainties of military exigencies, and liable to be changed at any time by the result of a movement of the opposite army, or the uncertain issue of a battle. To hold that such an occupation changed the relation of the people of the occupied territory into that of enemy to the rest of their own nation, would be to establish a rule leading to the most absurd consequences. Today the people would be friends to the invader, and to-morrow they would be his enemies. To-day they would belong to and be a part of one belligerent power, to-morrow they would, without permanent conquest, be a part of the opposite power. This rule is *601 entirely too uncertain to admit of practical application, -or ever to be adopted in a matter of such serious concern. It would, besides, overturn many of the well established and universally recognized rules of International Law, and be inconsistent with the. exercise of the rights of an occupying enemy to such an extent, that it can not properly, have a place in so refined, yet, so complete and • natural a system of rules as make up the body of the Law of Nations at the present day. For instance, it is settled that an occupying army of invasion may levy military contributions upon the inhabitants of the conquered territory, though modern usage has discouraged the practice. This is certainly inconsistent with the idea; that by military occupation, the enemy relation had been changed. When the army of the United States occupied a portion of the territory of Mexico, it is a well known fact that regulations were made by the Commander of - the army for its control, under the authority of the President of the United States: this was done simply, on the principle, that some sort of rule was a necessity; and that it was proper to establish such regulations as would meet this demand. In all such cases, the enemy relation of the inhabitants is distinctly recognized and assumed as still continuing — modified, it is true, in some aspects by the fact of occupation, but not changed in its essential character.
It is insisted in the bill, that the contract for the purchase of Mrs. Shaw’s life estate in the property was void, as in violation of the Act of *602 Congress of July 13th, 1861, and the President’s proclamation of August 16th, 1861, issued in pursuance of said Act. This proclamation declared certain States to be in revolution, and forbade commercial intercourse between them and what is known as the loyal States, excepting certain- sections of some of the former; and also making a like exception in favor of such other sections as may from time to time be occupied and controlled by the forces of the United States. It need but be remarked on this proclamation, that it only regulated by its terms, the intercourse of such occupied territory with the United States, and did not pretend to regulate the intercourse of the people of such occupied enemy territory with the rest of the Confederate territory not so occupied. It amounts to nothing more than a permission on the part of the Federal government to the people of the occupied territory to trade with the United States: — it, in no wise, purported to change the relation of that territory, as enemy territory, except so far as such permit to trade might extend.
This was merely a matter of policy on the part of the Federal Government; as is shown by the fact, that in March, 1863, another proclamation was issued by the President, in which it was recited, in substance, that embarrassments had grown out of the exceptions contained in the former proclamation, in favor of trade between the occupied territory and the United States, and all commercial intercourse with the Confederate States was forbidden, except by special license — such trade was declared unlawful, and to continue so until *603 the War should cease, and notice thereof be given by the proclamation of the President of the United States— and such continued to be the rule to the close of the War. In this proclamation certain territory and places were excepted . from its operation, which need not be-designated here, as Tennessee was not one of them.
This was so held in the case of the United States v. 100 Barrels of Cement, where the property of a citizen of West Tennessee was held forfeited, because it was sought to be transported from St. Louis, Missouri, to Jackson, Tennessee, without a special license. The same doctrine was held in numerous other cases. We cite the above, because the parties resided in West Tennessee, and it occurred in July, 1862, after the Federal occupation of this portion of our State. (See case, reported in the American Law Register, vol. 3, p. 135.)
We need only, refer to one other fact in support, of this view of the case; i. e. — that Tennessee was held in military subjection and governed as enemy’s-territory, occupied by an invading foe, up to the end. of the War: Andrew Johnson was appointed Military Governor of the State, and thus the State continued: to be governed till the cessation of hostilities, and the-so-called election of Brownlow in 1865.
We conclude, then, that as the question of intercourse between countries, in time of war, is dependent upon the existence or non-existence of the enemy relation between the two places' — -and that as the enemy relation did not exist between Tennessee and the State of Georgia at the time of the transaction, by reason of' *604 "the simple Federal occupation by the military invading force, therefore, the contract cannot be held void .on this account. When territory is thus occupied by an invading force during a war, the Military Commander may establish such- military regulations as serve his own particular ends; he may forbid the inhabitants of the territory, thus occupied, from passing beyond his lines, and enforce his orders by military penalties: but, subject to the danger of having such penalties inflicted, there is nothing in the Law of Nations that forbids intercourse between the inhabitants of territory temporarily occupied by an invading army, and those of the country of which they make a part.
The enemy relation does not cease to exist between the people of such occupied territory and their invaders, simply by reason of the invasion and occupation of the territory; nor is it created by such occupation, as against the people of the territory to which they belonged before the invasion. It is needless to review in. detail the cases referred to by counsel in the argument. We will say, however, that they have been carefully examined, not only in this case, but in previous cases before us, and so far as they hold a doc-' trine different from that laid down in this opinion, we cau not yield our assent to them.
We may.add, that the error, in most of them, consists in applying the rule established between recognized enemies, as to commercial intercourse, to quite a different state of facts; i. e. — to the case of the inhabitants of belligerent territory, temporarily occupied *605 by an invading foe, and making the rule of non-intercourse applicable to a people thus situated. We-think that the rule which is applicable to belligerent, territory and its citizens, can have no proper application to such a' case as the one before us.
Upon the authorities, it may well be considered doubtful, whether the rule of non-intercourse, even as-between belligerents, has any application to the conveyance -and transfer of' real estate, situated in one belligerent territory, by a citizen of the other. It is-so maintained by the Supreme. Court of Massachusetts, in a case well considered, upon what «appears to be a careful review of a number of cases, and we are inclined to give the doctrine of the case our approval, and to think its conclusions are sound: Kershaw v. Kelsey, 1 Am. Rep., 154.
Assuming the doctrine contended for by the complainant’s counsel to be correct, as to the question of the illegality of the sale in this case, by reason of the-enemy relation of the parties, there is another ground on which the complainant would, undoubtedly, be repelled from a court — that is upon the principle, that each was equally guilty of the wrong, if any was' committed, and that if no public policy is to be subserved by favoring either party, a court would aid neither,, but leave them to the consequences of their own acts. It is unnecessary to criticise the cases on this question. Upon the assumption of the illegality of the sale, the rule would have an unquestionable application, and be conclusive of the right of the complainant in this case.
*606 The Chancellor’s decree must be reversed, and the complainant’s bill dismissed. The costs will be paid by the complainant.